[Cite as *State v. Ware*, 2024-Ohio-1105.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

    CASE NO.  1-22-60

    v.

CORNELIUS WARE, JR.,

    O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Allen County Common Pleas Court
Trial Court No. CR2021 0314

Judgment Affirmed

Date of Decision: March 25, 2024

APPEARANCES:

    *William T. Cramer* **for Appellant**

    *John R. Willamowski, Jr.* **for Appellee**

**HESS, J.**

**{¶1}** Defendant-appellant, Cornelius Ware, Jr. ("Ware"), appeals from a judgment of the Allen County Court of Common Pleas convicting him, following a jury trial, of attempted rape and gross sexual imposition. Ware presents three assignments of error asserting (1) his due process rights were violated by the admission of other-acts evidence that he used illegal drugs; (2) his due process rights were violated by a limiting instruction on other-acts evidence that was likely to confuse and mislead the jury; and (3) indefinite prison terms imposed under the Reagan Tokes Law violate the jury trial guarantee, the doctrine of separation of powers, and due process principles under the federal and state constitutions. For the reasons which follow, we overrule the assignments of error and affirm the trial court's judgment.

*Facts and Procedural History*

**{¶2}** In October 2021, Ware was indicted on: (1) Count One, rape in violation of R.C. 2907.02(A)(1)(c) and (B); (2) Count Two, gross sexual imposition in violation of R.C. 2907.05(A)(5) and (C)(1); and (3) Count Three, sexual battery in violation of R.C. 2907.03(A)(2) and (B). He pleaded not guilty, and the matter proceeded to a jury trial.

{¶3} Sharon Thomas testified that Kashawnna Ware ("Kashawnna") (no relation to the defendant) and J.L. are her cousins. On September 1, 2020, Thomas hung out with Kashawnna at her home at 413 South Collett. Around 9:00 or 10:00 p.m., some female friends joined them, and they drank and played games. By around 11:00 p.m. or 12:00 a.m., Thomas was drunk, and J.L., then age 16, came to the home drunk. Thomas could not recall whether J.L. also drank at Kashawnna's home but thought she "mostly likely did." J.L. "ended up being sloppy." Around 2:00 or 3:00 a.m., J.L. "threw up on her shirt and on her bra and stuff," and Thomas and Kashawnna took her upstairs and put her in the bathtub. They took off her shirt and pants and helped "get all the throw up off of her." Thomas walked J.L. to Kashawnna's daughter's bedroom, put bedding on the floor for J.L., and laid J.L. down "with a towel wrapped around her and her bra still on." Thomas thought J.L. had underwear on but was not positive. When Thomas put J.L. in the bedroom, she "was out of it. Like, she wasn't even up for real. She was asleep, like, drunk passed out."

{¶4} At some point, Ware, Thomas's friend with whom she had had sex "a couple of times," arrived at Kashawnna's house. Thomas had sex with Ware. Thomas thought they probably also drank together but was not sure. She initially expressed uncertainty about Ware's condition that night but later testified that he was drunk like her. Thomas testified she was not aware of drugs at the home but then testified there was "[p]robably" weed.

{¶5} Thomas testified that Ware went upstairs to use the bathroom and was gone for 20 to 30 minutes. Thomas went to Kashawnna's daughter's bedroom and saw J.L. on her back on the floor where Thomas had left her with Ware "between [her] legs." J.L. did not move. She was "[l]aying down asleep. Like out of it. Not up. Don't know what's going on [sic]. Her eyes were closed." Thomas was not sure if J.L. was wearing underwear. Thomas saw Ware on his knees "stroking," by which Thomas meant that "[i]t looked like he was penetrating her." His jeans were pulled down towards his knees, and he was "going back and forth." Thomas did not see Ware touch J.L.'s breasts, touch her inner thighs with his hands, or rub her buttocks. Thomas did not recall seeing his penis or telling a detective that she did. Thomas testified that she saw blood on a "cover" next to Ware's cigarette and knew J.L. was menstruating because she got a tampon from Kashawnna earlier. Ware told Thomas "to get the fuck out." Thomas had "Jock" get Ware out of the house. Ware returned to the front porch crying and tried "to beg and tell" Thomas "that he didn't do anything and he was sorry." Thomas told him to "get the fuck out of my face."

{¶6} Later that morning Thomas and Ware communicated via Facebook. Ware wrote, "We didn't do nothing was about too but I swear u wouldn't even let a nigga talk to u wen u was crying u my nigga always [sic]." Thomas wrote, "Fuck you I hate you," and "I caught you bro." Ware wrote, "I'm mad asf u ain't caught shit u seen we was about to I respect u and u kno that[.] I didn't mean to hurt ur

feelings in no way I hurt my feelings[.] It take a man to apologize [sic]." Thomas wrote, "Man you're sick asf dawg I swear to god you are older than her mom dude I'll never fuck with u again [sic]." Ware wrote, "Whaat[.] We didn't fuck [sic]." Thomas wrote, "I caught you." Ware wrote, "U ain't caught shit u seen us bout to but I'm beside dat[.] She just said cum hold her [sic]."

{¶7} J.L. testified that she arrived at Kashawnna's house sober around 10:00 p.m. J.L. drank with everyone, and she and Thomas got "sloppy drunk." Maybe an hour after arriving, J.L. was "throwing up everywhere." She fell asleep on the couch and "woke up a little bit" laying in the bathtub, which was overflowing. She did not recall how she got there or what she was wearing. Thomas got her out, wrapped her in a towel, put her in Kashawnna's daughter's room, and closed the door. Then "everything went black." J.L. woke up wearing only a bra "with a whole bunch of throw up in it." She got clothes somewhere, Thomas told J.L. what she had seen, and J.L. went to the hospital. The only men J.L. recalled seeing that night were "Kashawnna's ex-boyfriend, Kivante, and his friend." J.L. testified that prior to September 1, 2020, she never met Ware, and on September 2, 2020, she did not ask anyone to hold her, kiss anyone, or consent to sexual activity. J.L. testified that she was menstruating at the time but did not recall anyone giving her a tampon.

{¶8} Kashawnna testified that J.L. arrived at her home drunk and went upstairs to take a bath. Someone told Kashawnna the bathtub was overflowing, and the ceiling was leaking. She and Thomas went upstairs and found J.L. sitting naked

in the overflowing bathtub. J.L. said she was drunk, and her speech was slurred. She was "[k]ind of" able to stand up on her own, and Thomas wrapped her in a towel and put her in Kashawnna's daughter's room. Kashawnna took J.L.'s clothes to the basement to wash them and cleaned up the water. At that point, the only people in the home were her, Thomas, and J.L. Kashawnna went to bed after her uncle Jock came over and woke up when J.L. came to her door wrapped in a blanket and asked where her clothes were. Kashawnna told J.L. they were in the washer and let J.L. wear some of her clothes. Kashawnna did not testify that she saw Ware during the relevant timeframe.

{¶9} A registered nurse examined J.L. on September 2, 2020, and did not observe any injuries on J.L.'s body. Vaginal samples taken during the exam did not contain a DNA profile foreign to J.L. Rectal samples contained a DNA mixture. The major profile was consistent with J.L., and the remaining mixture came from at least two male contributors. Ware could not be excluded as a contributor.

{¶10} Detective Brian Snyder of the Lima Police Department interviewed Ware in August 2021. The state played a roughly 45-minute long video and audio recording of the interview. Ware says Thomas[1] invited him to Kashawnna's home for "drinking or whatever." Ware says something about "everybody doing powder" and "pills." He says that he arrived at the home around 12:15 a.m., there were about eight or nine people there, and everybody was drinking and "already fucked up"

---

[1] In the recording, Ware refers to Thomas as "Sharon Thompson" and "Sharon."

when he got there. Ware says, "I'm just buzzin, you know I had took a few e pills and a drunk a few beers at the time [sic]." Ware says he drank liquor after he arrived and that "we was drinking until about three [sic]." Ware says that he "was fucked up" because he was "off e pills already before I came there," and he explains that "e pills" are ecstasy.

{¶11} Around 2:00 a.m., he had to go to the bathroom because he was throwing up the "e pills and liquor," had "to poop," and "had the runs." He went upstairs. The "girl" people said he had the "situation with" was in the shower. He used the bathroom anyway and threw up in the toilet. Kashawnna told him to help the girl out of the tub, and Ware was "like shit I'm fucked up I can't." He went downstairs to smoke. He told Thomas to get the girl because she was "too heavy" for him, and he was "drunk as hell." Thomas refused. Ware went back upstairs and told Kashawnna to get the girl out of the bathroom because he had to "finish throwing up and shitting or whatever." Ware said that he and the girl were "both shitting on ourselves." Ware says, "I don't know, I think they had some ecstasy in our drinks," and "Whatever they had in the drink, it, it fucked my stomach up." Detective Snyder asks Ware if the girl was "drunk drunk." Ware says, "I couldn't remember because we all fucked up [sic]." He says, "I'm off ecstasy. I don't know what she's on." Detective Snyder says, "But to say, to say that she was fucked up would probably be on par with everybody else?" Ware says, "Everybody's drunk. The whole house is fucking drunk." Ware says that everybody was "fucked up"

when he got there. Ware later says that he "didn't even know what was going on that night. We all fucked up [sic]."

**{¶12}** Ware tells Detective Snyder that Kashawnna helped the girl out of the shower and told him to bring a garbage bag upstairs. He went downstairs and went to the store to get cigarettes. When he returned, Thomas "wanted to fuck," but he was "like I gotta go upstairs to help baby baby [sic]." Thomas said the girl was "alright" and that he did not need to go up there, but he wanted to make sure she was "alright or whatever." He went upstairs smoking a cigarette. The girl was wearing a t-shirt or a towel and said, "Lay down. Hold me. Make sure I'm ok baby." He laid down and held her, and she started "kissing on" him. Ware says, "I'm a man, I kiss back." Ware then says that to "make a long story short," all he remembers is Thomas coming in "like oh, so ya'll fucking or whatever when you're supposed to be downstairs fucking me." Ware says he is not sure how long he was upstairs because "we probably been dozed off [sic]." Ware says the girl's uncle came and asked what they were doing. The girl said, "Nothing unc [sic]." Ware was "like shit we just layin' down or whatever [sic]." Later Thomas talked about going to the police, and Ware's "attention was oh, I must have fucked a young girl [sic]." Ware says, "I didn't know how old she was," and "You know, to my attention, she was older cause everybody was drinking, you feel me. And this was basically what we do is cocaine at the time. I don't do it no more. But at the time we was doing cocaine, ecstasy, and all that stuff, you feel me [sic]." Ware thought

Thomas was either mad because he did not "fuck her" or because the girl was "underage."

**{¶13}** Detective Snyder asks how far Ware and J.L. went. Ware says, "We fucked up." He remembers bringing a bag in and laying with her. They kissed, he held her, and he "woke up" when his cigarette burnt his finger, and Thomas was "right there cussing us out." Ware denies that his pants were down when Thomas came in the room and says he was wearing basketball shorts. He then admits it is possible he slipped the shorts down. Detective Snyder asks if any part of Ware's body touched J.L.'s vagina, buttocks, or breasts. Ware says, "I'm sure my hands did probably touch all on her breasts." Detective Snyder again asks about her vagina, and Ware says, "I can't. We fucked up [sic]." Detective Snyder asks if Ware got his "dick in her." Ware says that he cannot remember and that "we're fucked up." Detective Snyder asks Ware, "What if there was DNA that was found?" Ware says, "All I can say is I was fucked up." He says that once J.L. told him to lay down with her, he probably "dozed off." He was "off ecstasy and cocaine." Ware later says that he drinks "a lot," that his "body can hold it," and that he has never "shit on" himself and thrown up.

**{¶14}** Detective Snyder asks Ware if he and J.L. had sex or there was just foreplay, and Ware says that he cannot remember and that "we was fucked up [sic]." He says that after he gave her "the best lay down hold me tight shit," he just remembers waking up with a cigarette burn on his hand, and Thomas right there.

Later, Detective Snyder asks Ware whether it is plausible he had sex with J.L. Ware says that he "could of" but does not know. Ware later says that "everybody was fucked up," that he and Thomas "do cocaine," and that he does not know what "the other person was off of because everybody was already fucked, this whole house is fucked up. Some people do e pills, some people don't. Some people was doing coke, some people didn't [sic]." Ware then says, "I [inaudible] do coke or e pills at the time." Ware later says, "I do cocaine," and that was the "only thing at the time, that's the only thing that makes me run to the bathroom." Ware says that was "my drug of choice," and he would "never go back to that type of lifestyle. Drinking, smoking, doing e pills. Just because of this situation." Ware later tells Detective Snyder that Thomas was trying to "fuck" him when he "first came through the door," but he was "too busy trying to get drunk and smoke and do all the cocaine."

{¶15} Detective Snyder asks if Ware's DNA could have been on J.L.'s "privates," and Ware says that he does not know and that it "could have." Ware says that he thought J.L. was "old enough if ya'll had doing e pills and drinking with your cousin or niece or whoever she was to them [sic]." Detective Snyder asks Ware, "If you could say something to that girl right now what would you say?" Ware says that he would apologize for what happened and say her family should not have been drinking and doing pills with her. At one point, Detective Snyder asks if Ware wants to write something to her. Ware indicates that he does and writes a note stating:

To whom it may concern my name is Cornelius Kiyon Ware Jr. I need to let you know I have children 9 girls 9 boys. I will tell them everyday since I seen I had a warrant for Attempted rape that the[y] should not consume drugs nor Alcohol. I want you to know I found out how old you actually are. Through Tayonna Jones which is Brooke Jones Niece, but nene Brooke Jones Daughter. Said ya'll was cousi[n] I instantly felt hurt like why would they be drinking with a minor. I have kids myself. At the time I did multiple drugs. Today I do None because the situ-ation im in today. I was there drinkin[g] doing drugs and partying with everyone else Sharon wanted to have sex I was just making sure we both was ok I was in the bathroom throwing up and using the restroom why'll doing that I remember us both saying we fucked up I feel so terrible after hearing your a few years older than my child and if I was sober this could never happen. I can remember Sharon saying what was yall doing you didnt come fucking lay with me. Then your uncle came like bro let's go I couldn't realize at the time why people was so mad I can remember calling Sharo[n] that morning asking who you where why was she mad, she just saying it's cool I got you Im taking her to police station at first Im thinking she trying to set me up cause I wouldnt fornicate with her, but no[w] that I found out your correct age I need to say I apologize for whatever happened that day. I ask that you please forgive me for even coming to you as intoxicated as we was I usually just goto sleep but I remember this day forever, because I would never consume drugs and just being to friendly and helpful being intoxicated wanting to get out the house if I stayed hom[e] instead of coming outside drunk or high off of drugs. I just figured not to do none at all. I promise I was just being a peer thinking you where my age or atleast near it. Hoping you can understand[d] I apologize and If I wasn't intoxicated this would not happened. I have kids of my own. Please forgive me and do not drink with fam nor friends. To the the point we do not know how or whats going on.[2]

{¶16} Following Detective Snyder's testimony, the court instructed the jury:

There was evidence in that testimony of the Detective and specifically in that interview that was played for you, evidence of the use of Ecstasy and the use of Cocaine by the defendant. If you believe that

---

[2] The state introduced a copy of the note into evidence instead of the original, and it appears some of the note was cut off in the copying process. We have transcribed the note verbatim except for bracketed material we added to complete some of the words that appeared to be cut off.

evidence that would be evidence of potentially other bad acts, or, other criminal behavior. Evidence of other crimes or wrongs is not admissible to prove the character of a person in order to show that he acted in conformity with that character. In other words, you can't consider that evidence, if you believe that evidence of other wrongs, such as using Ecstasy or Cocaine, you can't consider that to prove the character of Mr. Ware in order to show that he acted in conformity with that character. Now, that kind of evidence, however, is admissible and you can consider that type of evidence to prove other things, such as, well, in this case preparation, opportunity, intent, knowledge. But it can't be used for any other purpose. Okay?

Later, the court admitted the interview recording and a copy of the note into

evidence and instructed the jury:

Now, evidence was received about the defendant using Cocaine and Ecstasy which is evidence of crimes or wrongs other than the offenses with which the defendant is charged in this trial. The evidence about the commission of crimes or wrongs other than the offenses with which the defendant is charged in this trial cannot be considered for any other purpose than the purposes I will identify. It was not received, and you may not consider it, to prove the character of the defendant in order to show that he acted in conformity with that character. It does not follow from the defendant's past acts that he committed the particular crimes that are charged in this case. The State has the burden of proving each element of the particular crimes currently at trial beyond a reasonable doubt. The State cannot satisfy its burden merely by implying that the defendant committed these crimes because his other acts suggest a propensity to commit crime.

The evidence of other acts was received only for the limited purposes of proving any of the following. Opportunity. You may consider the evidence of other acts to show the defendant being at 413 South Collett, using Cocaine or Ecstasy, showed that the defendant had the opportunity to commit the offenses with which he is charged in this case. Or, intent. You may, but are not required to, infer from the evidence of other acts by the defendant that it is more probable than not that the defendant intended to commit the offenses charged in this case. The question is whether, under the circumstances, the detailed facts of the charged offenses and other acts strongly suggest

that an innocent explanation is not plausible. Or, preparation. You may consider the evidence of other acts to determine whether it shows that the defendant prepared to commit the offenses with which he is charged in this case. Before you can consider the evidence of other acts for purposes of showing the defendant prepared to commit the offenses charged, the evidence must show the defendant's prior preparatory acts were either part of the same transaction as the offenses for which the defendant is on trial or that the other acts were part of a sequence of events leading up to the commission of the offenses in question. Or, knowledge. You may consider evidence of the other acts to determine whether or not it shows the defendant had knowledge that [J.L.'s] ability to resist or consent was substantially impaired because of a mental or physical condition.

The evidence of other acts cannot be considered for any other purpose.

**{¶17}** On Count One, the jury found Ware not guilty of rape but guilty of the lesser included offense of attempted rape. The jury found him guilty of Count Two, gross sexual imposition. On Count Three, the jury found him not guilty of sexual battery but guilty of the lesser included offense of attempted sexual battery. The trial court found Counts One and Three merged, and the state elected to proceed to sentencing on Count One. The court sentenced Ware to five to seven and a half years in prison for attempted rape and 18 months for gross sexual imposition, and the court ordered that the sentences run concurrently.

*Assignments of Error*

**{¶18}** Ware presents three assignments of error:

Assignment of Error Number One: Appellant's rights to due process were violated by the admission of other-acts evidence that appellant used illegal drugs.

-13-

Assignment of Error Number Two: Appellant's due process rights were violated by a limiting instruction on other-acts evidence that was likely to confuse and mislead the jury.

Assignment of Error Number Three: Indefinite prison terms imposed under the Reagan Tokes Law violate the jury trial guarantee, the doctrine of separation of powers, and due process principles under the federal and state constitutions.

*First Assignment of Error*

**{¶19}** In the first assignment of error, Ware contends that his due process rights were violated by the admission of other-acts evidence that he used illegal drugs.

Legal Principles

**{¶20}** " 'A hallmark of the American criminal justice system is the principle that proof that the accused committed a crime other than the one for which he is on trial is not admissible when its sole purpose is to show the accused's propensity or inclination to commit crime.' " *State v. Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, 161 N.E.3d 651, ¶ 20, quoting *State v. Curry*, 43 Ohio St.2d 66, 68, 330 N.E.2d 720 (1975). "This common-law principle is embodied in Evid.R. 404(B)." *Id.* at ¶ 21. Evid.R. 404(B)(1) states: "Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." "In other words, [']"evidence which tends to show that the accused has committed other crimes or acts independent of the crime for which he stands trial is not admissible to prove a

defendant's character or that the defendant acted in conformity therewith." ['] "

*State v. Bruce*, 2023-Ohio-3298, 224 N.E.3d 715, ¶ 18 (3d Dist.), quoting *State v.*

*Wendel*, 2016-Ohio-7915, 74 N.E.3d 806, ¶ 21 (3d Dist.), quoting *State v.*

*Hawthorne*, 7th Dist. Columbiana No. 04 CO 56, 2005-Ohio-6779, ¶ 24. Evid.R.

404(B)(2) provides that such evidence "may be admissible for another purpose, such

as proving motive, opportunity, intent, preparation, plan, knowledge, identity,

absence of mistake, or lack of accident." However, "[t]he exceptions allowing the

evidence 'must be construed against admissibility, and the standard for determining

admissibility of such evidence is strict.' " *State v. Conway*, 109 Ohio St.3d 412,

2006-Ohio-2815, 848 N.E.2d 810, ¶ 61, quoting *State v. Broom*, 40 Ohio St.3d 277,

533 N.E.2d 682 (1988), paragraph one of the syllabus.

**{¶21}** The Supreme Court of Ohio has set forth a three-part analysis for

determining the admissibility of other-acts evidence, stating that

> to be admissible, (1) the evidence must be relevant, Evid.R. 401, (2)
> the evidence cannot be presented to prove a person's character to
> show conduct in conformity therewith but must instead be presented
> for a legitimate other purpose, Evid.R. 404(B), and (3) the probative
> value of the evidence cannot be substantially outweighed by the
> danger of unfair prejudice, Evid.R. 403.

*State v. Graham*, 164 Ohio St.3d 187, 2020-Ohio-6700, 172 N.E.3d 841, ¶ 72, citing

*State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, ¶ 20,

*reconsideration granted*, 133 Ohio St.3d 1512, 2012-Ohio-6209, 979 N.E.2d 1290

(court of appeals ordered to address remaining assignments of error). "The

admissibility of other-acts evidence pursuant to Evid.R. 404(B) is a question of law." *Id.*, citing *Hartman* at ¶ 22. "The court is precluded from admitting improper character evidence under Evid.R. 404(B), but it has discretion to allow other-acts evidence that is admissible for a permissible purpose." *Id.*, citing *Hartman* at ¶ 22. "[T]he trial court's weighing of the probative value of admissible evidence against the danger of unfair prejudice to the defendant pursuant to Evid.R. 403(A) involves an exercise of judgment and will be reviewed for an abuse of discretion." *State v. Worley*, 164 Ohio St.3d 589, 2021-Ohio-2207, 174 N.E.3d 754, ¶ 117, citing *Hartman* at ¶ 30.

{¶22} However, Ware concedes that he has forfeited all but plain error because the record does not indicate his trial counsel objected to the drug use evidence. *See Graham* at ¶ 64. "For plain error to apply, the trial court must have deviated from a legal rule, the error must be plain, i.e., an obvious defect in the proceeding, and the error must have affected the defendant's 'substantial rights.' " *State v. Keith*, 3d Dist. Marion No. 9-22-28, 2023-Ohio-3428, ¶ 9, quoting *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002). " '[T]o demonstrate that the trial court's error affected a substantial right, the defendant must establish that there is a reasonable probability that, but for the trial court's error, the outcome of the proceeding would have been otherwise.' " *Id.*, quoting *State v. Sutton*, 3d Dist. Seneca No. 13-21-11, 2022-Ohio-2452, ¶ 50. "This in turn requires the defendant to show ' "that the probability of a different result is 'sufficient to undermine

confidence in the outcome' of the proceeding." ' " *Sutton* at ¶ 50, quoting *State v. Myers*, 154 Ohio St.3d 405, 2018-Ohio-1903, 114 N.E.3d 1138, ¶ 130, quoting *United States v. Dominguez Benitez*, 542 U.S. 74, 83, 124 S.Ct. 2333, 159 L.Ed.2d 157 (2004), quoting *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). We take "[n]otice of plain error * * * with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.

### Pertinent Statutes

{¶23} Ohio's rape statute prohibits engaging "in sexual conduct with another who is not the spouse of the offender" when "[t]he other person's ability to resist or consent is substantially impaired because of a mental or physical condition * * *, and the offender knows or has reasonable cause to believe that the other person's ability to resist or consent is substantially impaired because of a mental or physical condition * * *." R.C. 2907.02(A)(1)(c). The sexual battery statute prohibits engaging "in sexual conduct with another, not the spouse of the offender," when "[t]he offender knows that the other person's ability to appraise the nature of or control the other person's own conduct is substantially impaired." R.C. 2907.03(A)(2). The gross sexual imposition statute prohibits having "sexual contact with another, not the spouse of the offender," when "[t]he ability of the other person to resist or consent * * * is substantially impaired because of a mental or physical

condition * * *, and the offender knows or has reasonable cause to believe that the ability to resist or consent of the other person * * * is substantially impaired because of a mental or physical condition * * *." R.C. 2907.05(A)(5). " 'Sexual conduct' means vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another." R.C. 2907.01(A). " 'Sexual contact' means any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B).

Relevance

{¶24} Ware contends that evidence he used drugs was not relevant for any of the purposes for which the trial court instructed the jury it could use the evidence. Ware maintains that his "use of cocaine does not make it more likely that he had an opportunity to rape [J.L.], unless maybe it kept him awake." Ware claims that he "took the drugs before he came to the party, long before he knew [J.L.] was even there," so "the drug use could not have been a part of any preparation for raping [J.L.] and would not tend to show that he intended to rape [J.L.]." In addition, Ware asserts that his drug use had "no tendency to prove that he had knowledge of [J.L.'s] level of impairment because there was no evidence that [he] used cocaine or other

-18-

illegal drugs with [J.L.]" The state asserts there is evidence Ware "did ecstasy and cocaine with the victim (as one of the people at the party that he claims were all doing ecstasy and cocaine)," and that evidence was "relevant to show knowledge of the victim's impairment."

{¶25} " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. "Evidence which is not relevant is not admissible." Evid.R. 402. "It is almost always true that propensity evidence will have some relevance. Indeed, such evidence is excluded 'not because it has no appreciable probative value but because it has too much.' " *Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, 161 N.E.3d 651, at ¶ 25, quoting 1A Wigmore, *Evidence*, Section 58.2, at 1212 (Tillers Rev.1983). "But in Evid.R. 404(B) cases, the inquiry is not whether the other-acts evidence is relevant to the ultimate determination of guilt. Rather, the court must evaluate whether the evidence is relevant *to the particular purpose* for which it is offered." (Emphasis sic.) *Id.* at ¶ 26, citing *Curry*, 43 Ohio St.2d at 73, 330 N.E.2d 720. "That is to say, the other-acts evidence must be probative of a 'purpose other than the person's character or propensity to behave in a certain way.' " *Id.*, quoting *United States v. Gomez*, 763 F.3d 845, 860 (7th Cir.2014) (en banc). "Trial courts must keep in mind that it is not enough to say that the evidence is relevant to a nonpropensity purpose. The nonpropensity purpose for which the evidence is

-19-

offered must go to a 'material' issue that is actually in dispute between the parties." *Id.* at ¶ 27, quoting *Huddleston v. United States*, 485 U.S. 681, 686, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988).

**{¶26}** <u>Opportunity</u>. The trial court instructed the jury that it could consider evidence that Ware used drugs "to show the defendant being at 413 South Collett, using Cocaine or Ecstasy, showed that the defendant had the opportunity to commit the offenses with which he is charged in this case." Contrary to what Ware asserts, there is evidence that he used drugs at Kashawnna's home. For instance, his note states, "I was there drinkin[g] doing drugs and partying with everyone else." However, we do not see how Ware's drug use showed he had the opportunity to commit the charged offenses, and the state has offered no plausible explanation for how it did so. Moreover, opportunity was not a material issue in dispute. Ware admitted that he was at the home, that he had an encounter with J.L., that he probably touched her breasts, and that it was possible he had sex with her. Thus, we conclude evidence that Ware used illegal drugs was not relevant to show opportunity.

**{¶27}** <u>Intent</u>. The trial court instructed the jury that it could infer from the evidence that Ware used drugs that it was "more probable than not" that Ware intended to commit the charged offenses. It is not apparent how Ware's drug use made it "more probable than not" that he intended to commit the charged offenses, and the state has offered no explanation for how it did so. Ware's statements suggest his drug use made it less probable that he intended to commit the charged offenses

because he lacked the capacity to form such an intent. But as the trial court instructed the jury, "[v]oluntary intoxication may not be taken into consideration in determining the existence of a mental state that is an element of a criminal offense." *See* R.C. 2901.21(E). Thus, we conclude evidence that Ware used illegal drugs was not relevant to show intent.

{¶28} Preparation. The trial court instructed the jury it could consider the evidence of Ware's drug use "to determine whether it shows that" he "prepared to commit" the charged offenses. We do not see how Ware's drug use showed that he prepared to commit rape, sexual battery, or gross sexual imposition, and the state has offered no explanation for how it did so. Thus, we conclude evidence that Ware used illegal drugs was not relevant to show preparation.

{¶29} Knowledge. The trial court instructed the jury that it could consider evidence that Ware used drugs to determine whether it showed Ware had knowledge that J.L.'s "ability to resist or consent was substantially impaired because of a mental or physical condition." The jury could not find that Ware lacked such knowledge due to his drug use because, again, as the trial court instructed the jury, "[v]oluntary intoxication may not be taken into consideration in determining the existence of a mental state that is an element of a criminal offense." *See* R.C. 2901.21(E). And evidence that Ware used illegal drugs before he went to Kashawnna's home was not relevant to whether he had the requisite knowledge because there is no evidence that Ware used those drugs with J.L.

-21-

{¶30} However, there is also evidence Ware used drugs with J.L. at the home. Although Ware stated that he did not know what J.L. was "on" or "off of," he also stated, "You know, to my attention, she was older cause everybody was drinking, you feel me. And this was basically what we do is cocaine at the time. I don't do it no more. But at the time we was doing cocaine, ecstasy, and all that stuff, you feel me [sic]." Ware claims he was just noting that "he would generally do cocaine, ecstasy, and 'all that stuff.' " But when his statement about "doing cocaine, ecstasy, and all that stuff" is read in context, one can infer that Ware was saying he thought J.L. was older than she was because they used cocaine and ecstasy together. Evidence that Ware used drugs with J.L. makes it more probable that he knew her ability to resist or consent was substantially impaired because of a mental or physical condition. His knowledge was a material issue in dispute given the conflicting evidence about J.L.'s condition at the time of Ware's encounter with her. Thus, we proceed to the next step of the three-part analysis with respect to that evidence.

Purpose

{¶31} The state did not present evidence that Ware used drugs with J.L. to prove Ware's character to show conduct in conformity therewith. The state presented the evidence for a legitimate other purpose—showing his knowledge. Although the state did not explicitly assert that it was presenting the evidence for that purpose at trial, the state did not object to the court's limiting instructions.

Probative Value Versus Unfair Prejudice

**{¶32}** Ware contends that the prejudicial impact of evidence of his drug use "far outweighed any minimal probative value." Ware claims the evidence "had little to no evidentiary value because it did not tend to prove anything of consequence." He claims the prejudice from the evidence was "immense" because evidence of involvement in drugs is highly prejudicial and indicates not only a propensity to use drugs but also a willingness to break laws. He asserts the prejudice was heightened in this case because there was no evidence that he had a criminal record or had engaged in other illegal behavior apart from the charged offenses. Therefore, the drug use evidence muddied his image as an otherwise law-abiding citizen. Ware acknowledges a limiting instruction "may help mitigate the prejudicial impact of other-acts evidence," but citing *United States v. Bell*, 516 F.3d 432, 446-447 (6th Cir.2008), he asserts an instruction "that directs the jury to use evidence for a purpose for which it is not probative does nothing to abate the prejudicial impact, and actually enhances prejudice by causing confusion and misleading the jury into erroneously relying on such evidence."

**{¶33}** Evid.R. 403(A) states: "Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice * * *." The Supreme Court of Ohio has explained:

> "Exclusion on the basis of unfair prejudice involves more than a balance of mere prejudice. If unfair prejudice simply meant prejudice, anything adverse to a litigant's case would be excludable under Rule

403. Emphasis must be placed on the word 'unfair.' Unfair prejudice is that quality of evidence which might result in an improper basis for a jury decision. Consequently, if the evidence arouses the jury's emotional sympathies, evokes a sense of horror, or appeals to an instinct to punish, the evidence may be unfairly prejudicial. Usually, although not always, unfairly prejudicial evidence appeals to the jury's emotions rather than intellect."

*Oberlin v. Akron Gen. Med. Ctr.*, 91 Ohio St.3d 169, 172, 743 N.E.2d 890 (2001), quoting *Weissenberger's Ohio Evidence*, Section 403.3, at 85-87 (2000).

**{¶34}** "The trial court's analysis under [Evid.R. 403(A)] should be robust, and courts should be mindful of '[t]he natural and inevitable tendency * * * to give excessive weight to the vicious record of crime thus exhibited and either to allow it to bear too strongly on the present charge or to take the proof of it as justifying a condemnation, irrespective of the accused's guilt of the present charge.' " (Second alteration and ellipsis sic.) *Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, 161 N.E.3d 651, at ¶ 29, quoting 1A Wigmore, *Evidence*, Section 58.2, at 1212. "[I]mportant considerations" are "the extent to which the other-acts evidence is directed to an issue that is actually in dispute," "whether the prosecution is able to present alternative evidence to prove the same fact through less prejudicial means and whether the other-acts evidence is probative of an essential element of the crime or an intermediate fact in the case." *Id.* at ¶ 31-32. "Because other-acts evidence 'almost always carries some risk that the jury will draw the forbidden propensity inference,' it will often present the dangers that Evid.R. 403(A) seeks to protect against." *Id.* at ¶ 33, quoting *Gomez*, 763 F.3d at 857. "Thus, when such evidence

is only slightly probative of a nonpropensity theory but has a high likelihood of unfairly prejudicing the defendant or confusing or misleading the jury, the evidence must be excluded." *Id.*

{¶35} Although evidence that Ware used drugs with J.L. was prejudicial, Ware has not demonstrated that the danger of unfair prejudice was such as to warrant its exclusion. The evidence was directed to an issue in dispute—whether Ware knew that J.L.'s ability to resist or consent was substantially impaired because of a mental or physical condition. Although the prosecution had other evidence to prove that fact, Ware knowing or having reasonable cause to believe that J.L.'s ability to resist or consent was substantially impaired because of a mental or physical condition was an essential element of the rape and gross sexual imposition offenses. R.C. 2907.02(A)(1)(c); R.C. 2907.05(A)(5). Such knowledge was also relevant to an essential element of the sexual battery offense—that Ware knew J.L.'s ability to appraise the nature of or control her own conduct was substantially impaired. R.C. 2907.03(A)(2). In addition, the fact that Ware used drugs did not appeal to the jury's emotions rather than intellect. His drug use does not tend to arouse emotional sympathies, evoke a sense of horror, or appeal to an instinct to punish.

{¶36} Contrary to what Ware asserts, the trial court reduced any danger of unfair prejudice by issuing limiting instructions to the jury. Ware's reliance on *Bell* is misplaced. In that case, the defendant was charged with possession of crack cocaine and marijuana with intent to distribute and possession of a firearm by a

convicted felon. *Bell*, 516 F.3d at 437. A federal district court admitted into evidence the defendant's four prior state court convictions—two for possession of cocaine base with intent to distribute and two for possession of marijuana with intent to distribute—under Fed.R.Evid. 404(b) for the purpose of proving intent and absence of mistake or accident. *Id.* at 437-439. The court instructed the jury it could only consider the evidence for those purposes and that it should keep in mind that the defendant "is on trial here only for the offenses that he is charged with in this indictment," that the government had "to prove its case beyond a reasonable doubt," and that "the defendant is not on trial for any previous act, but only for those that are charged here in this indictment." *Id.* at 439. The court gave additional similar instructions before the jury deliberated. *Id.* The jury found the defendant guilty as charged. *Id.*

{¶37} The Sixth Circuit Court of Appeals held that the district court erred in concluding the evidence at issue was admissible to prove absence of mistake or accident because the case did not present an issue of mistake or accident. *Id.* at 442. The circuit court also held that the district court erred in concluding the evidence was admissible to prove intent because the evidence was not probative of whether the defendant intended to possess and distribute drugs in the instant case. *Id.* at 444. The circuit court also found that even if the evidence had some probative value on the issue of intent, the value was slight, and the prejudicial impact was significant. *Id.* at 445-446. The circuit court found that the limiting instructions "did little to

abate this prejudicial impact." *Id.* at 446. The circuit court explained that the instructions "did remind the jury that [the defendant] was on trial only for the charged offenses and not for his prior bad acts." *Id.* "However, by directing the jury to consider these acts for the purpose of ascertaining [the defendant's] intent, the court was implicitly approving the kind of reasoning which would suggest that because [he] was a drug distributor in the past, the jury should consider him to have distributed drugs in the present case." *Id.* The instructions also "created the possibility for an even greater prejudicial impact by directing the jury to consider the evidence of [the] prior convictions for the purpose of absence of mistake, a matter which was not even at issue in the case." *Id.* at 446-447. The circuit court found that "[s]uch confusion of the purpose of this other acts evidence was likely to create more rather than less prejudice." *Id*. at 447. Therefore, the circuit court found that even if the prior convictions were properly admissible to demonstrate intent, the district court erred "when it found that the highly prejudicial impact of the evidence did not substantially outweigh the slight, if any, probative value it may have provided." *Id.* at 447.

{¶38} Like the instructions in *Bell*, the instructions in this case were overly broad because they indicated the jury could consider evidence of Ware's drug use for purposes for which it was not relevant. However, unlike the district court in *Bell*, the trial court in this case explained to the jury that it could not use the drug use evidence "to prove the character of Mr. Ware in order to show that he acted in

conformity with that character." Prior to deliberations, the court again told the jury it could not consider the evidence "to prove the character of the defendant in order to show that he acted in conformity with that character." The court then elaborated on this concept, explaining that it did "not follow from the defendant's past acts that he committed the particular crimes that are charged in this case," that the state had the burden to prove each element of the crimes on trial beyond a reasonable doubt, and that the state could not "satisfy its burden merely by implying that the defendant committed these crimes because his other acts suggest a propensity to commit crime." These instructions are consistent with those recommended by *Hartman*. *See Hartman,* 161 Ohio St.3d 214, 2020-Ohio-4440, 161 N.E.3d 651, at ¶ 71.

**{¶39}** Given these instructions, even if the jury was confused about how the drug use evidence related to purposes for which we have found it irrelevant, there could be no confusion that the jury could not consider the evidence to prove Ware's character in order to show that he acted in conformity with that character. "[A] jury is presumed to follow the court's instructions." *State v. Scott*, 3d Dist. Shelby No. 17-21-10, 2022-Ohio-2723, ¶ 40, citing *State v. Garner*, 74 Ohio St.3d 49, 59, 656 N.E.2d 623 (1995). And the fact that the jury acquitted Ware of rape and sexual battery suggests the guilty verdicts were not the result of improper consideration of the drug use evidence. *See generally State v. Jackson*, 2023-Ohio-2193, 220 N.E.3d 868, ¶ 73 (3d Dist.) (defendant's contention that he was prejudiced by admission of other-acts evidence undermined by jury's acquittal on one of the charges).

{¶40} For the foregoing reasons, we conclude the trial court did not err when it admitted evidence that Ware used drugs with J.L. for the purpose of proving Ware's knowledge. However, we must still consider the impact of the court's decision to admit evidence of Ware's drug use for other purposes for which we found it was not relevant.

Invited Error

{¶41} The state contends that Ware invited any error in the admission of evidence of his drug use. "The doctrine of invited error specifies that a litigant may not 'take advantage of an error which he himself invited or induced.' " *State v. Garrett*, 171 Ohio St.3d 139, 2022-Ohio-4218, 216 N.E.3d 569, ¶ 203, quoting *Hal Artz Lincoln-Mercury, Inc. v. Ford Motor Co.*, 28 Ohio St.3d 20, 502 N.E.2d 590 (1986), paragraph one of the syllabus. For the doctrine to apply, the complaining party "must have been ' "actively responsible" for the trial court's error.' " *State v. McAlpin*, 169 Ohio St.3d 279, 2022-Ohio-1567, 204 N.E.3d 459, ¶ 220, quoting *State v. Campbell*, 90 Ohio St.3d 320, 324, 738 N.E.2d 1178 (2000), quoting *State v. Kollar*, 93 Ohio St. 89, 91, 112 N.E.196 (1915). The Supreme Court of Ohio " 'has found invited error when a party has asked the court to take some action later claimed to be erroneous, or affirmatively consented to a procedure the trial judge proposed.' " *Garrett* at ¶ 203, quoting *Campbell* at 324. " '[M]ere "acquiescence in the trial judge's erroneous conclusion" ' will not support a finding of invited

error." *McAlpin* at ¶ 220, quoting *Campbell* at 324, quoting *Carrothers v. Hunter*, 23 Ohio St.2d 99, 103, 262 N.E.2d 867 (1970).

**{¶42}** The state asserts that "it was the clear strategy of defense counsel to claim that no one knew what happened that night, including the defendant, because everyone was consuming alcohol and illicit drugs." The state directs our attention to the following. During opening statements, defense counsel stated that "[e]verybody, unfortunately, was intoxicated – some using alcohol, some using Cocaine, some Ecstasy. People were using lots of drugs and alcohol and it was out of control." During its direct examination of Thomas, the state asked her about marijuana, and on cross-examination, defense counsel said, "[b]ut, it was pretty much more than weed?" During closing arguments, defense counsel told the jury, "More importantly, you don't even know what went on that night and no one else does, either." The state also asserts that the evidence about cocaine and ecstasy came from Ware's interview and that when the state "sought to publish the video of the interview, it was noted in a sidebar that defense counsel had reviewed the video, that portions were removed, and that defense counsel had been provided a copy of the edited video since at least the week prior to trial." The state maintains that under these circumstances, "it becomes clear that if any error occurred, it was invited as a defense strategy."

**{¶43}** Ware did not invite the trial court's error in admitting evidence of his drug use to prove opportunity, intent, or preparation and did not invite the court's

error in admitting evidence of his pre-party drug use to prove knowledge. The fact that the evidence at issue came from Ware's interview is irrelevant. Moreover, defense counsel did not invite or induce the court to admit Ware's statements for irrelevant purposes by reviewing the interview footage and tacitly consenting to the redaction of certain content. The record does suggest that part of defense counsel's strategy was to argue that no one knew what happened due to intoxication from alcohol and/or drugs. But defense counsel did not induce or invite the trial court to admit evidence of Ware's drug use for irrelevant purposes by making a general reference to people using drugs in opening statements, asking a question about drugs which did not elicit any testimony that Ware used them, and arguing that no one knew what happened during closing arguments. Ware merely acquiesced in the trial court's erroneous conclusion that evidence of his drug use was admissible for purposes for which we have found it irrelevant.

### Substantial Rights

{¶44} Ware claims the improper admission of evidence of his drug use affected his substantial rights. Ware asserts that "[t]he key issue in this case was credibility because this was, effectively, a he-said, she-said case" between him and Thomas. Ware asserts that Thomas "had a motive to twist the evidence due to her sexual relationship" with him and "was caught in numerous obfuscations during her testimony." Ware asserts that "[a]gainst that backdrop, the improper evidence of drug use unfairly prejudiced [his] credibility by indicating that he was someone

willing to engage in illegal activities for pleasure." He asserts that under these circumstances, there is a "reasonable probability that the improper evidence of drug use affected the outcome of the trial."

**{¶45}** Even if the trial court's error in admitting evidence of Ware's drug use for some purposes for which it was not relevant was obvious, Ware has not shown that there is a reasonable probability that, but for the trial court's error, the outcome of the proceeding would have been otherwise. As we explained above, the trial court properly admitted evidence that Ware used cocaine and ecstasy with J.L. to show his knowledge that J.L.'s ability to resist or consent was substantially impaired because of a mental or physical condition. Thus, even if the trial court had not erred by admitting evidence of Ware's drug use for purposes for which it was not relevant, the jury still properly heard evidence that Ware used cocaine and ecstasy under the knowledge ruling.

**{¶46}** Moreover, as the state points out, the trial court could have admitted the drug use evidence apart from Evid.R. 404(B) because it was intrinsic to the charged offenses. " 'Evid.R. 404(B) only applies to limit the admission of so-called 'other acts' evidence that is 'extrinsic' to the crime charged.' " *State v. Grant*, 2023-Ohio-2720, 223 N.E.3d 1, ¶ 57 (3d Dist.), quoting *State v. Gawron*, 7th Dist. Belmont No. 20 BE 0009, 2021-Ohio-3634, ¶ 43. " 'In other words, "Evid.R. 404(B) does not apply when the acts are intrinsic as opposed to extrinsic, i.e., the acts are part of the events in question or form part of the immediate background of

the alleged act which forms the basis for the crime charged." ' " *Id.*, quoting

*Gawron* at ¶ 43, quoting *State v. Wainscott*, 12th Dist. Clermont No. CA2015-07-

056, 2016-Ohio-1153, ¶ 19. We have stated:

> "When other acts are 'inextricably intertwined' with [an] offense, those acts are said to be intrinsic to the alleged crime. In other words, acts that are 'inextricably intertwined' aid understanding by 'complet(ing) the story of the crime on trial.' *United States v. Siegel*, 536 F.3d 306, 316 (4th Cir. 2008). 'Evidence of other crimes is admissible when evidence of the other crime is so blended or connected with the crime on trial as the proof of one crime incidentally involves the other crime, *or explains the circumstances*, or tends logically to prove any element of the crime charged.' *State v. Long*, 64 Ohio App.3d 615, 617, 582 N.E.2d 626 (9th Dist. 1989)."

(Alterations and emphasis sic.) *Id.*, quoting *State v. Stallworth*, 11th Dist. Lake No.

2013-L-122, 2014-Ohio-4297, ¶ 38. " 'Stated differently, * * * "other acts"

evidence is inextricably intertwined with charged conduct when testimony about the

other acts is "necessary to give the complete picture of what occurred." ' " (Ellipsis

sic.) *Id.*, quoting *State v. Sinclair*, 2d Dist. Greene No. 2002-CA-33, 2003-Ohio-

3246, ¶ 35, quoting *State v. Wilkinson*, 64 Ohio St.2d 308, 318, 415 N.E.2d 261

(1980).

**{¶47}** Ware's drug use was an integral part of his version of events. Ware

suggested the charged offenses did not happen because his drug use caused him to

fall asleep during the encounter. Thus, his drug use went directly to whether rape,

sexual battery, and gross sexual imposition occurred. Ware also claimed that his

drug use affected his ability to recall key information about his encounter with J.L.

The fact that he was under the influence of drugs bore on the credibility of his statements to law enforcement. *See generally State v. Wilson*, 2d Dist. Montgomery No. 29349, 2023-Ohio-27, ¶ 64 (evidence of defendant's drug use "was appropriately admitted for credibility and believability purposes" because "jury was entitled to consider extent to which [his] drug use affected his ability to recall events, which, in turn, impacted his believability and credibility"). And as the state suggested during closing arguments, the fact that Ware was able to recall numerous details about what occurred but claimed he could not recall key information, like whether he had sex with J.L., suggested that he was lying about his level of intoxication to protect himself. *See generally State v. Brodbeck*, 10th Dist. Franklin No. 08AP-134, 2008-Ohio-6961, ¶ 44, quoting *State v. Robinson*, 6th Dist. Lucas No. L-06-1182, 2008-Ohio-3498, ¶ 202 (" 'lies told by an accused are admissible evidence of consciousness of guilt, and thus of guilt itself' "). Thus, evidence of Ware's drug use was inextricably intertwined with the charged offenses and could have been admitted apart from Evid.R. 404(B).

**{¶48}** Ware's suggestion that there is a reasonably probability that the jury found him guilty of offenses because it improperly inferred from the drug use evidence that he was willing to engage in illegal activities for pleasure is not well-taken. As discussed above, the trial court gave detailed instructions explaining that the jury could not use the drug use evidence as propensity evidence. And we

presume the jury followed those instructions. *Scott*, 3d Dist. Shelby No. 17-21-10, 2022-Ohio-2723, at ¶ 40, citing *Garner*, 74 Ohio St.3d at 59, 656 N.E.2d 623.

**{¶49}** We also observe that Ware fails to address the fact that several of his own statements support the jury's findings of guilt. Ware made a statement from which one could infer that he used drugs with J.L., and he admitted that he saw J.L. defecate on herself in the bathtub, that she needed help to get out of the bathtub, and that she was "fucked up." Ware told Detective Snyder that he probably touched J.L.'s breasts, and Ware sent Thomas messages indicating that he was about to have intercourse with J.L. when Thomas came to the bedroom.

**{¶50}** Ware has not shown that, had the trial court not admitted evidence of his drug use for some improper purposes, the probability of a different result is sufficient to undermine confidence in the outcome of the trial. Therefore, Ware has not met his burden to show that the trial court's error affected his substantial rights.

Summary

**{¶51}** The trial court did not err when it admitted evidence that Ware used drugs with J.L. for the purpose of showing he knew that her ability to resist or consent was substantially impaired because of a mental or physical condition. The trial court did err when it admitted evidence of Ware's drug use for the purpose of showing opportunity, knowledge, and intent, and admitted evidence of his pre-party drug use for the purpose of showing knowledge. However, this error did not rise to

-35-

the level of plain error because Ware has not shown it affected his substantial rights. Accordingly, we overrule the first assignment of error.

*Second Assignment of Error*

**{¶52}** In the second assignment of error, Ware contends that his "due process rights were violated by a limiting instruction on other-acts evidence that was likely to confuse and mislead the jury." Ware maintains that the first limiting instruction "was confusing and likely to mislead the jury because it merely listed several permissible uses for the evidence of drug use without being tailored to the case." Ware claims that the second limiting instruction, while longer than the first, "was actually more confusing and likely to mislead the jury on its substance." Ware asserts that the second instruction "again listed too many permissible uses to provide the jury with any guidance" and was akin to telling the jury it could consider the drug use evidence for any purpose. He asserts that the instruction "provided very little in the way of specific tailoring" because the trial court did not explain how the evidence might be probative of intent, preparation, or knowledge. He asserts that the trial court "made an attempt at tailoring" with respect to the issue of opportunity. However, he claims that the opportunity instruction was unsupported by the evidence, which was that he used drugs before going to Kashawnna's home, and that opportunity "was not even an issue in the case" because it was undisputed that he was at the home Ware claims there is "a reasonable probability that the improper evidence of drug use affected the outcome of the trial" because, as he argued under

-36-

the first assignment of error, "credibility was key to this case and the improper evidence of drug use unfairly attacked [his] credibility by indicating that he was someone willing to engage in illegal activities for pleasure."

## Legal Principles

{¶53} " '[T]he trial judge is in the best position to gauge the evidence before the jury and is provided the discretion to determine whether the evidence adduced at trial was sufficient to require an instruction.' " *State v. Rentschler*, 2023-Ohio-3009, 223 N.E.3d 957, ¶ 70 (3d Dist.), quoting *State v. Fulmer*, 117 Ohio St.3d 319, 2008-Ohio-936, 883 N.E.2d 1052, ¶ 72. "Thus, we generally review alleged errors in jury instructions for an abuse of discretion." *Id.*, citing *State v. Blanton*, 2015-Ohio-4620, 48 N.E.3d 1018, ¶ 55 (3d Dist.), citing *State v. Guster*, 66 Ohio St.2d 266, 271, 421 N.E.2d 157 (1981). In reviewing jury instructions, " 'a sole instruction must be viewed within context of the whole set rather than in isolation.' " *Id.*, quoting *State v. Moore*, 3d Dist. Putnam No. 12-06-18, 2007-Ohio-5905, ¶ 26.

{¶54} Crim.R. 30(A) states that "[o]n appeal, a party may not assign as error the giving or the failure to give any instructions unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection." When a defendant fails to object to an instruction, the defendant forfeits all but plain error. *State v. Steele*, 138 Ohio St.3d 1, 2013-Ohio-

2470, 3 N.E.3d 135, ¶ 29. Ware's trial counsel did not object to the jury instructions, and Ware concedes plain error review applies.

{¶55} The Supreme Court of Ohio has explained that when a court issues a limiting instruction with respect to other-acts evidence, "it is not realistic to simply list all the permissible uses and expect jurors to go through each one and determine the use for which the evidence is properly considered." *Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, 161 N.E.3d 651, at ¶ 69. "To tell the jury that a certain piece of evidence may be considered as evidence of 'proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident,' Evid.R. 404(B), imparts nothing meaningful and is akin to telling the jurors that the evidence may be considered for any purpose." *Id.* "[T]he instruction should be tailored to the facts of the case." *Id.* at ¶ 70. "[C]ourts should explain, in plain language, the purposes for which the other acts may and may not be considered." *Id.* "Rather than recounting to the jury every purpose listed in Evid.R. 404(B), our pattern jury instructions direct trial courts to state the specific purpose for which the other-acts evidence is being admitted in that case." *Id.*, citing *Ohio Jury Instructions*, CR Section 401.25 (2008).

{¶56} The Supreme Court of Ohio has also stated that "jury instructions should be tailored to better enable jurors to understand the prohibition on the use of other-acts evidence to make inferences about the defendant's disposition to commit criminal acts." *Id.* at ¶ 71. " 'Lay people are capable of understanding the

foundational principle in our system of justice that "we try cases, rather than persons." ' " *Id.*, quoting *Gomez*, 763 F.3d at 861, quoting *People v. Allen*, 429 Mich. 558, 566, 420 N.W.2d 499 (1988). "Rather than simply telling jurors that they may not consider certain evidence 'to prove the character of the defendant in order to show that he acted in conformity with that character,' *Ohio Jury Instructions*, CR Section 401.25, the court may explain that the reason for this rule is that 'it does not follow from the defendant's past acts that he committed the particular crime charged in this case,' *Gomez* at 861." *Id.* "And jurors would be well served by guidance connecting the limiting instruction to the state's burden of proof: the government has the burden of proving each element of *this particular crime* beyond a reasonable doubt, and its burden is not satisfied by an inference that the defendant committed this crime because his past acts suggest a propensity to commit crimes." (Emphasis sic.) *Id.*, citing *Gomez* at 861.

### Analysis

{¶57} In our discussion of the first assignment of error, we found that the trial court did not err when it admitted evidence that Ware used drugs with J.L. to prove knowledge. Consistent with *Hartman*, the trial court instructed the jury in plain language that it could consider evidence of Ware's drug use to determine whether it showed he knew that J.L.'s ability to resist or consent was substantially impaired because of a mental or physical condition. Thus, we find no error in the

trial court's instructions to the extent they indicated the jury could consider evidence that Ware used drugs with J.L. to prove knowledge.

**{¶58}** In our discussion of the first assignment of error, we also found that the trial court erred when it admitted evidence of Ware's drug use to prove opportunity, intent, and preparation, and admitted evidence of his pre-party drug use to prove knowledge. Undoubtedly, a limiting instruction "should be given as to the *correct* permissible use" of evidence. (Emphasis sic.) *State v. Carlson*, 2d Dist. Champaign No. 2021-CA-43, 2022-Ohio-4548, ¶ 20. Thus, the court erred when it instructed the jury it could consider evidence of Ware's drug use to prove opportunity, intent, and preparation and implied the jury could consider evidence of his pre-party drug use to prove knowledge.

**{¶59}** However, even if this error was obvious, it did not rise to the level of plain error because Ware has not shown it affected his substantial rights. Although the instructions were overly broad, they were not akin to telling the jurors the drug use evidence may be considered for any purpose. The trial court did not tell the jury it could use the evidence for any of the nine purposes specifically identified in Evid.R. 404(B). Rather, it is evident that the court tried to follow *Hartman* by stating the four specific purposes for which it was admitting the evidence. Even though the court erroneously admitted the evidence for some purposes, consistent with *Hartman*, the trial court gave the jury detailed instructions explaining that it could not use the drug evidence as propensity evidence. Therefore, even if the jury

was confused about how the drug use evidence related to purposes for which we have found it irrelevant, there could be no confusion that the jury could not consider the evidence to prove Ware's character in order to show that he acted in conformity with that character. And as we previously explained, the jury is presumed to follow the court's instructions, and there is no indication it did not do so in this case.

{¶60} For the foregoing reasons, we overrule the second assignment of error.

*Third Assignment of Error*

{¶61} In the third assignment of error, Ware contends that indefinite prison terms imposed under the Reagan Tokes Law violate the jury trial guarantee, the doctrine of separation of powers, and due process principles under the federal and state constitutions. Ware concedes his trial counsel did not raise this issue, so plain error review applies. Ware also acknowledges his constitutional arguments are similar to those previously rejected by this court and being considered by the Supreme Court of Ohio in two cases which were pending at the time he filed his appellate brief.

{¶62} The Supreme Court of Ohio has since resolved those cases in *State v. Hacker*, ___ Ohio St.3d ___, 2023-Ohio-2535, ___ N.E.3d ___. The court held that the Reagan Tokes Law does not implicate the right to a jury trial or violate the separation-of-powers doctrine. *Hacker* at ¶ 25, 28. Given *Hacker*'s determination of these issues, we reject Ware's jury trial and separation-of-powers arguments.

**{¶63}** *Hacker* also rejected the due-process challenge to the law but confined its discussion to the Due Process Clause of the Fourteenth Amendment to the United States Constitution because the defendants had not "mounted a separate challenge under Ohio's Due Course of Law Clause, Article I, Section 16 of the Ohio Constitution." *Id.* at ¶ 29, fn. 3. In this case, Ware asserts that the Reagan Tokes Law violates both clauses. We reject Ware's due process challenge under the Fourteenth Amendment because *Hacker* is directly dispositive of it, but we must still evaluate his due-process challenge under Article I, Section 16 of the Ohio Constitution.

**{¶64}** This court has previously considered and rejected due-process challenges to the Reagan Tokes Law based on both the Fourteenth Amendment and Article I, Section 16 of the Ohio Constitution. *See, e.g., State v. Marshall*, 3d Dist. Allen No. 1-22-70, 2023-Ohio-3751, ¶ 5-9; *State v. Boedicker*, 3d Dist. Allen Nos. 1-22-03, 1-22-04, 2022-Ohio-2992, ¶ 8, 23-28. " 'We have invariably concluded that the indefinite sentencing provisions of the Reagan Tokes Law do not facially * * * infringe on defendants' due process rights.' " *Marshall* at ¶ 7, quoting *State v. Ball*, 3d Dist. Allen No. 1-21-16, 2022-Ohio-1549, ¶ 59. However, it does not appear that we have explicitly addressed whether the Fourteenth Amendment and Article I, Section 16 of the Ohio Constitution provide equivalent protection in considering these challenges.

**{¶65}** "The Ohio Constitution is a document of independent force." *Arnold v. Cleveland*, 67 Ohio St.3d 35, 616 N.E.2d 163 (1993), paragraph one of the syllabus. However, " '[s]ince 1887, [the Supreme Court of Ohio] has equated the Due Course of Law Clause in Article I, Section 16 of the Ohio Constitution with the Due Process Clause of the Fourteenth Amendment to the United States Constitution.' " *Worley*, 164 Ohio St.3d 589, 2021-Ohio-2207, 174 N.E.3d 754, at ¶ 77, fn. 2, quoting *State v. Aalim*, 150 Ohio St.3d 489, 2017-Ohio-2956, 83 N.E.3d 883, ¶ 15. The court has stated that "[t]he 'due course of law' provision is the equivalent of the 'due process of law' provision in the Fourteenth Amendment to the United States Constitution." *State v. Hand*, 149 Ohio St.3d 94, 2016-Ohio-5504, 73 N.E.3d 448, ¶ 11. The court has also stated that it has "not held that Article I, Section 16 of the Ohio Constitution provides broader due-process protections than the Fourteenth Amendment to the United States Constitution." *Worley* at ¶ 77, fn. 2. *But see Simpkins v. Grace Brethren Church of Delaware, Ohio*, 149 Ohio St.3d 307, 2016-Ohio-8118, 75 N.E.3d 122, ¶ 34 (lead opinion) (stating that in *State v. Bode*, 144 Ohio St.3d 155, 2015-Ohio-1519, 41 N.E.3d 1156, ¶ 23-24, the court held that Ohio's " 'due course of law' provision afforded a juvenile a broader right to counsel than that afforded by the Due Process Clause of the United States Constitution").

**{¶66}** Ware does not argue the Due Course of Law Clause provides greater protection than the Fourteenth Amendment Due Process Clause in the context of the

Reagan Tokes Law. Given the Supreme Court of Ohio's statements in *Worley*, *Aalim*, and *Hand*, we conclude they are equivalent. Consequently, *Hacker* is indirectly dispositive of Ware's due-process challenge under Article I, Section 16, of the Ohio Constitution, and we reject it.

{¶67} Indefinite prison terms imposed under the Reagan Tokes Law do not violate the jury trial guarantee, the doctrine of separation of powers, or due process principles under the federal and state constitutions. Therefore, Ware has not shown that the trial court erred, let alone committed plain error, when it imposed an indefinite prison term on Count One under the Reagan Tokes Law. Accordingly, we overrule the third assignment of error.

*Conclusion*

{¶68} Having overruled the assignments of error, we affirm the trial court's judgment.

***Judgment Affirmed***

**ZIMMERMAN and MILLER, J.J., concur.**

**/hls**

**\*\*Judge Michael D. Hess of the Fourth District Court of Appeals, sitting by Assignment of the Chief Justice of the Supreme Court of Ohio.**